[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION 
This is an action to dissolve the marriage of the parties on the ground of ASS?. CLERK irretrievable breakdown. Each party was represented by legal counsel. They presented evidence January 17, January 18, March 7, and March 8, 2002. In addition, a hearing was had April 8, 2002, CT Page 4436 regarding the defendant's claim for attorney's fees associated with this matter.
The more credible evidence leads to the following factual findings. The plaintiff and the defendant, whose maiden name was Frances Pelrin, married May 23, 1970, at Meriden, Connecticut. They have resided in the State of Connecticut continuously for more than one year next before the date of the complaint. There were two children issue of the marriage, but neither is now a minor. The defendant has no other minor children. Neither party has received financial support during the marriage from the State of Connecticut or any municipality thereof The marriage of the parties has broken down irretrievably.
The plaintiff husband is 52 years old and has a high school education. He was in the air force from 1968, to 1972. He worked as a hairdresser both before and after his military service. In June, 1973, he began work at Pratt Whitney. He has worked there steadily for 29 years. His job title is "quality lead man". The plaintiff took on second jobs early in the marriage to enhance the family income. He worked seven and a half years as a short-order cook, then two years as a gauge inspector, then two years at Talcott Machine Tool Company.
The plaintiff worked the second shift (3:30 p.m. to midnight) at Pratt Whitney for more than two decades before switching to the first shift a little over a year ago. The move to the first shift reduced the plaintiffs pay by about 10 percent. Current earnings are $70,200 per annum. His pension is a substantial asset of the marriage. It will pay $44 per month for each year of employment. His prospects for additional pension earnings in the future are greater than the prospects of the defendant.
The plaintiff has a tendency towards high blood pressure. The plaintiff underwent knee surgery in December, 2001. He has made a complete recovery from the surgery and his health is now good.
The defendant is 54 years old and has a high school education. After the plaintiff was discharged from the air force in 1972, the parties resided at 115 Oak Street, Meriden, Connecticut. By then the parties had an infant son. Their daughter was born in 1975. From the late 1970's to the late 1980's, the defendant was self-employed at home as a baker. She did wedding cakes, as well as pies and cakes for local restaurants. She baked three days a week and made deliveries on three other days of the week. From her earnings she bought the food and clothing for the family. She was the primary caregiver for the children.
In 1993, the defendant began a job at Pratt Whitney part-time at the CT Page 4437 Aircraft Club. She continued baking for one year thereafter, but then gave up the baking. After five years, the defendant began work full-time as a material expediter in the aircraft-engine services division at Pratt Whitney. She has been at that job four years with a short layoff early in the year 2001. In addition to paying for household food and clothing, the defendant paid first $150 per week, then $200 per week, to the plaintiff beginning in 1998, to reduce the parties' credit card debt. Because the defendant has been fulltime at Pratt Whitney less than five years, her pension is not yet vested. She earns $42,400 per annum. Her health is good.
The defendant is thrifty by nature. She was a coupon clipper. She made her husband's lunch for work each day to save on expenses. She did not spend money on herself In the 1970's, the defendant handled the family finances and bill paying. Beginning in 1979, the plaintiff chose to take over the finances.
115 Oak Street, Meriden (the residence) is the childhood home of the defendant. She, her brother, and her two sisters were raised in that home by their grandfather. When the parties moved into the residence in 1973, they shared it with the defendant's brother and her sister Isabel Pelrin. It was fully furnished. The residence was owned equally by the three sisters and the brother. No mortgage encumbered the residence. The defendant's brother moved out of the residence in 1974, or 1975. Isabel remained in the residence and still resides there. Although the parties paid no rent or mortgage, they undertook all the real estate tax, homeowners insurance, utilities, and maintenance expenses at the residence. They also made improvements to the residence, such as a new patio root remodeling the pantry, furnace and hot water heater replacement, vinyl siding, a new refrigerator, and finishing the attic into usable rooms.
In 1995, the parties approached the non-resident brother and sister to buy out their interests in the residence. The parties undertook a mortgage for $72,000. They paid $15,000 apiece to the brother and sister to acquire their interests; they paid the balance due on the defendant's car; and they used the remaining $30,000 to $35,000 to pay off credit card debt. In 1997, they took a home equity loan in the amount of $21,000. In the summer of 2001, Isabel quitclaimed her one-quarter interest in the residence to the defendant, subject to Isabel's life use. At the time of the trial on this case the title of the residence is 1/2 joint in the parties, 1/2 sole in the defendant, and life use as to Isabel Pelrin.
Isabel Pelrin stopped working in 1975, or 1976, when she developed serious illnesses, in particular heart problems and diabetes. She has CT Page 4438 been confined to a wheelchair for many years. Today, she is legally blind and is on kidney dialysis. A search is underway for an appropriate residential placement for her. Such a placement would probably invoke Title XIX eligibility. The court takes judicial notice that an issue could arise in the future for the defendant should the state seek a recapture of the residence value quitclaimed to the defendant in 2001, by Isabel.
Until she became eligible for social security in 1993, Isabel had no income. Other than the parties' rent-free use of the residence and Isabel's 2001 quitclaim of her interest in the residence to the defendant, Isabel made no significant monetary contribution to the household. When she began receiving social security and a small pension, Isabel took over the payment of her supplemental health insurance. Prior to that time, the parties paid all living expenses for Isabel and her health insurance premiums. The health insurance premiums were about $1200 per year from 1976, through 1984. Thereafter, the premiums rose each year to a cost of $4581 in 1993. Over the course of 1976, through 1993, the parties paid $35,000 out of pocket for Isabel's health insurance. It has always been a difficulty in the household that Isabel smokes cigarettes, while no one else in the household smokes. In addition, her disposition for the past several years has been cranky. Someone had to be at home with her at all times in case of a fall. Nevertheless, the parties and their children undertook the hands-on care and financial support of Isabel Pelrin willingly and without reproach. It is greatly to their credit that they have been able to maintain her in her home with good care these many years.
The two children attended parochial schools through the eighth grade at a cost of $400 to $500 apiece per year. For about ten years, the parties took an annual vacation trip to Arizona with the children. In 1994, 1995, 1997, and 1998 the parties took cruise vacations with friends. The plaintiff assured the defendant that these cruises were being paid out of his "special purpose" account, which was a savings account funded by regular withholdings from his paycheck. In fact, the "special purpose" account held no funds.
The plaintiff collected sports memorabilia. He also took occasional golfing vacations to Virginia Beach with friends. As to furniture purchases, the parties bought a new living room set ten years ago and a new bed. Given the parties' modest living style, the defendant's frugal expenditures, and the stable family incomes over the years, the parties might be expected to have ample savings and a rosy retirement future. Indeed, they have talked in recent years about their anticipated retirement. CT Page 4439
The parties have virtually no liquid assets and are well over $16,000 in credit card debt. The retirement discussions were a deception on the part of the plaintiff, perhaps a self deception as much as a deception of his wife. Because of his control of the finances, the plaintiff has known for several years that the parties cannot look to retirement in the foreseeable future unless he hits the lottery. The problem is and has been the plaintiffs gambling losses.
The plaintiff estimates that he has incurred about $12,000 in sports betting losses over the years of the marriage. There is no way for the court to put an exact figure on the plaintiffs gambling losses during the marriage. He frequently took large cash withdrawals from credit cards, but he asserts that he did this in order to put the cash into his checking account to pay off other credit cards or to pay debts and expenses in cash. Over the years there have been dozens of credit cards. It is apparent from the modest lifestyle of the parties, the income and living expenses of the parties, and the plaintiffs lack of credibility on the witness stand about his gambling habits and expenditures, that the gambling losses were tens of thousands, if not hundreds of thousands, of dollars over the course of the marriage.
At casinos the plaintiff likes blackjack. He has spent a few dollars a week on sports betting pools and fantasy football at his place of work. Telephone sports betting started around 1980. The plaintiff acknowledges that his gambling was "out of hand" between 1989, and 1994. However, he says that his worst year was 2000, when he was involved in sports betting over the Internet and lost about $5000 over the Internet. In fact, records entered into evidence for two credit cards covering the year 2000, show the losses over the Internet to be closer to $15,000. After he moved out of the marital residence December 31, 2000, the plaintiff attended some Gamblers Anonymous meetings for a short time in an effort to control his gambling. He states that he now restricts his gambling to casinos and office pools/fantasy football.
Before asserting his rights under the Fifth Amendment to the Constitution on the witness stand, the plaintiff testified as to his side employment related to his gambling. He distributed betting slips to prospective bettors and collected money from them. He did not prepare the betting slips himself, but was acting as an agent for others. His commission was 10 percent. The plaintiff testified that this practice continued for less than ten years, and ended by the beginning of the year 2001.
The plaintiff says that his wife was aware of his gambling. Early in the marriage she went with him to the racetrack on one occasion. Later she accompanied him on some of his trips to Las Vegas and East Coast CT Page 4440 casinos. She knew he was placing bets over the telephone on sporting events. She knew of his regular trips to the off-track betting parlor and jai alai. The plaintiff claims that the defendant could have discovered the extent of the plaintiffs credit card debt merely by examining the contents of mail addressed to the plaintiff. Since the plaintiff did not hide the financial records from his wife, he asserts that she should have known about the debt situation.
The defendant testified that she knew of the plaintiffs recreational gambling and believed him to be addicted to gambling, but had no idea of the cost of the gambling. She also did not know the extent of the credit card debt. Whenever the defendant raised to the plaintiff a question about the extent of the debt or the status of the family finances, the plaintiff assured the defendant that everything was fine. When the defendant asked whether the parties could afford the cruises, the plaintiff told her that his "special purpose" account was essentially a vacation savings plan and that he would be drawing down on that account to pay off the credit card expenditures for the vacations. The truth was that the "special purpose" account was never allowed by the plaintiff to accumulate any appreciable balance.
The plaintiff approached the defendant in 1993, about seeking a joint loan for payoff of credit card debt. He gave no description of the extent of the debt. The defendant did not want to incur such a liability and refused the request. The plaintiff applied to his parents at that time and borrowed $40,000 from them. That debt was repaid to the plaintiffs parents by early 2000, with interest, so that the total repaid was about $59,000. The plaintiff did not tell the defendant about the $40,000 loan or about the extent of the credit card debt. Substantial credit card debt remained even after the use of the $40,000 in 1993, to pay down credit cards. The defendant knew nothing of this. The plaintiff took a loan of $8,000 against his 401(k) thereafter without telling his wife. In 1995, the parties used $30,000 to $35,000 of the $72,000 borrowed on the residence to pay down credit cards. Thereafter, in 1997, the parties borrowed another $21,000 on a home equity line of credit to pay down credit cards. Unbeknownst to the defendant, several thousands of dollars of credit card debt continued to plague the parties. The plaintiff took a $15,000 loan through his savings plan at work in September, 2000, and a $9,000 loan against his 401(k) in September, 2001. This left a balance of $12,000 in the 401(k). He also incurred debt of $26,000 for the purchase of a new car in November, 2001.
Today, the plaintiffs credit card debt exceeds $16,000 and he owes $26,000 on his car. The first and second mortgages on the residence total about $72,000. The defendant asserts that she knew nothing of the debt situation, except for the mortgages on the residence, until after the CT Page 4441 plaintiff removed himself from the residence December 31, 2000. The court finds that the plaintiff actively sought to deceive the defendant as to the extent of his gambling losses just as he did in his testimony before the court.
Gambling has been a compulsion, and even an illness, for the plaintiff. Just as an alcoholic is not at fault for drinking alcohol, so also an addicted gambler should not be blamed for gambling. However, when an alcoholic drinks and causes damage to others, such as in an automobile accident, he is justly blamed and prosecuted for imposing a danger and injury upon others. The gambler must accept blame when he dissipates assets that are not his alone to lose and undermines trust in a marital relationship by lying about his money management to his spouse. It is ironic that the defendant was paying $200 per week to her husband in the year 2000, "to reduce the credit card debt" while he was adding considerably more than that amount each week in credit card debt from gambling losses.
For three years prior to the plaintiffs removal from the marital residence, the plaintiff worked the second shift at Pratt Whitney while the defendant worked the first shift. This, together with the increasing demands on the parties for the hands-on care of Isabel Pelrin, put a strain on the marriage. The plaintiff became unhappy and moved out of the residence December 31, 2000. The defendant's discovery, after the initiation of the dissolution of marriage proceedings, of the debt situation and the extent of the plaintiffs deceit concerning the family finances banished any possibility of the reconciliation of the parties.
Neither party had any significant assets at the outset of the marriage, except for the defendant's inherited interest in the residence in Meriden and her 150 shares of SBC Communications, Inc. common stock. The parties held the following assets and debts at the time of the hearing on the dissolution of their marriage:
A. Plaintiffs Assets
1. 2001 Mazda Tribute automobile
2. Computer and audio-visual equipment
3. Sports memorabilia collection
4. Personal checking account — $670
5. American Eagle Federal Credit Union IRAs — $4,000 CT Page 4442
6. Nationwide $5,000 life insurance policy — cash value $4,585
7. 401(k) at Pratt Whitney — $13,000 ($22,000 less $9,000 loan)
 8. Vested pension paying $44 for each year of service (29 years) — $1,276/mon. at age 65
 9. Expectancy of reimbursement for short-term disability for six-week period following recent knee surgery
B. Defendant's Assets
 1. One-half interest in residence at 115 Oak Street, Meriden, Connecticut, subject to Isabel Pelrin's life use interest
2. Figurine collection
3. Diamond ring purchased in 1999 in St. Martin
4. Personal checking and savings accounts — $3,500
5. 150 shares SBC Communications, Inc. common stock — $7,000
 6. Met Life $2,000 and $1,000 life insurance policies — cash value total $3,991; plus a term policy in the face amount of $57,000, but with no cash value.
7. 401(k) at Pratt Whitney — $7,146
 8. Unvested pension at Pratt Whitney. Defendant has worked 4 years; pension will vest after 5 years' employment.
C. Joint Assets
1. 1/2 interest in residence at 115 Oak Street, Meriden
2. 1995 Chevrolet Lumina automobile
3. Miscellaneous household furnishings
The defendant did not report her unvested pension as an asset on her financial affidavit at the time of trial. Her explanation for the omission was that she did not need to record an invested pension as an asset. Such a rationale is indefensible in light of the recent Connecticut Supreme Court decision in Bender v. Bender, 258 Conn. 733,785 A.2d 197 (2001). (Unvested pension benefits are property subject to CT Page 4443 assignment by the court pursuant to Connecticut General Statutes §46b-81.) However, the transgression of the defendant in omitting her unvested pension from her financial affidavit pales before the plaintiffs excuse for omitting his 29-year vested pension from his financial affidavit. He testified that he did know the value of his pension and therefore decided to make no mention of it on his affidavit.
Neither party provided persuasive evidence as to the market value of the residence at 115 Oak Street, Meriden, Connecticut. Since the plaintiffs valuation was based upon the City of Meriden assessed value at $128,000, the court has used that value as the more likely one for purposes of these orders.
D. Plaintiffs Debts
1. Legal costs for this action — $11,200
2. American Eagle Credit Union loan — $13,000
3. American Express credit card — $1,100
4. First USA Bank VISA card — $2,200
5. Charter One Financial loan on the 2001 Mazda — $26,000
E. Defendant's Debts
Legal costs for this action — $7,300
F. Joint Debts
1. First mortgage on 115 Oak Street, Meriden residence — $63,000
2. Home equity loan on 115 Oak Street, Meriden residence — $14,900
The court has considered all the criteria in General Statutes §§46b-62, 46b-81 and 46b-82 in light of the evidence presented by testimony and exhibits. The following are the orders of the court:
1. The marriage of the parties is dissolved and they are each declared to be single and unmarried.
2. Each party shall be responsible for his or her own medical/dental expenses in the future.
3. The plaintiff shall pay to the defendant as and for spousal support CT Page 4444 the sum of $220 per week until the death of either party, the remarriage of the defendant, or her cohabitation in a marriage-like relationship with another person.
4. The defendant shall be the sole owner of the residence at 115 Oak Street, Meriden, Connecticut, subject only to the life use of Isabel Pelrin. The plaintiff shall forthwith execute a quitclaim deed presented to him by the defendant to effectuate the transfer of title. The defendant shall be solely responsible for all mortgage and home equity payments, taxes, and homeowners insurance. She shall indemnify and save the plaintiff harmless as to those debts and all other expenses related to the maintenance of the residence.
5. The plaintiff shall retain the 2001 Mazda Tribute; the defendant shall be the sole owner of the 1995 Chevrolet Lumina. The plaintiff shall transfer to the defendant forthwith all of his right, title and interest in and to the Lumina. The defendant is responsible for all expenses and costs associated with the Lumina.
6. The defendant, as alternate payee, is awarded 50 percent of the plaintiffs pension accumulated at Pratt Whitney as of March 31, 2002. Until such time as the pension is in payment status as to the plaintiff as participant, the defendant shall be designated the sole survivor of the participant on the pension. The Qualified Domestic Relations Order shall be prepared and submitted to the plan administrator by the defendant at her expense on or before July 15, 2002. The plaintiff shall provide to the defendant the name and address of the plan administrator and the correct name of the pension plan on or before May 17, 2002. This court shall retain jurisdiction for review and approval of the Qualified Domestic Relations Order.
7. The defendant shall retain sole rights to her own pension at Pratt 
Whitney. All claims or rights of the plaintiff to that pension, whether as survivor or beneficiary or otherwise, are hereby extinguished.
8. Each party shall retain his or her own 401(k) defined contribution plan asset through Pratt Whitney to the exclusion of any right or claim of the other party.
9. The plaintiff shall retain his two Roth IRAs, to the exclusion of any claim by the defendant.
10. The plaintiff shall retain his personal checking account; the defendant shall retain her personal checking and savings accounts.
11. Each party shall retain sole ownership of life insurance policies CT Page 4445 insuring his or her own life. However, the plaintiff shall maintain the defendant as sole beneficiary on his Nationwide life insurance policy for so long as his alimony obligation continues. He shall also name the defendant as sole beneficiary on any life insurance or death benefit, exclusive of his tax-deferred benefits, which he now has as a matter of right from his employment at Pratt Whitney for so long as his alimony obligation continues.
12. The plaintiff shall retain sole rights to his expectancy of a short-term disability award.
13. The defendant shall retain 150 shares of SBC Communications, Inc. common stock.
14. The plaintiff is awarded the laptop computer, the DVD player, the stereo recording tape deck with four speakers, the CD changer, the diamond ring purchased in St. Martin in 1999, and all items of the sports memorabilia collection. He is also awarded: 1 of the 2 VCRs and the 4 stereo speakers located in the entertainment center; the upstairs television; some drinking glasses; come coffee mugs; an assortment of bath towels; a set of hand towels; a set of sheets; and all his personal collectibles.
15. The defendant is awarded the figurine collection and all tangible personal property now in or about the residence at 115 Oak Street, Meriden, Connecticut not otherwise specifically disposed of by these orders.
16. The plaintiff shall be solely responsible for the payment of debts showing in the Liabilities section of his financial affidavit submitted to the court dated March 7, 2002. He shall indemnify the defendant and save her harmless as to those debts. The plaintiff shall also indemnify and save the defendant harmless as to all other debts wholly or partly in his name, exclusive of the mortgage and home equity debts, whether or not showing on the said financial affidavit. The plaintiff shall indemnify and save the defendant harmless as to any debt of the parties, or either of them, found to be owing to the Internal Revenue Service or the Connecticut Department of Revenue Services.
17. Neither party is awarded attorney's fees in this matter.
 ___________________ Winslow, J.